IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

AT HUNTINGTON

CRIT MUNCY,

        Petitioner,

V.                                                  CIVIL ACTION NO. 3:06-0180

THOMAS McBRIDE, Warden,
Mt. Olive Correctional Complex,

        Respondent.

## **FINDINGS AND RECOMMENDATION**

On June 7, 2001, following a four-day jury trial in the Circuit Court of Wayne County, Crit Muncy was convicted on all counts of an Indictment in which he was charged with murder in the first degree and, in two counts, with malicious assault. On July 6, 2001, he was sentenced by the court to life imprisonment on the first degree murder conviction and to consecutive two to ten year sentences on the malicious assault convictions. As a consequence of the fact that the jury did not recommend mercy, his life sentence was without possibility of parole. Muncy's petition for an appeal from the convictions was refused by the Supreme Court of Appeals of West Virginia on March 11, 2003. Thereafter, Muncy filed a petition for writ of habeas corpus in the Circuit Court of Wayne County. Following an evidentiary hearing the petition was denied by order entered April 26, 2005. A petition for appeal from the denial of habeas relief was subsequently refused by the Supreme Court of Appeals, and Muncy then filed a petition for habeas relief under the provisions of 28 U.S.C. § 2254 with this Court. In his petition Muncy asserts that lawyers representing him were ineffective,

that he was denied the right to a fair and impartial grand jury, that a video statement was not given "knowingly and intelligently," that the evidence was "insufficient" and that the trial court erred in allowing his trial to proceed without re-examining his mental competency to stand trial.

Briefly summarized, the evidence presented at trial established that on October 29, 1999, Kenneth Lyle Messer was shot and killed and his wife, Rylenea Messer, and brother, Paul Messer, were wounded. On that day Lyle Messer, with help from a number of individuals, was attempting to move a mobile home from a trailer park on Marrowbone Creek in southern Wayne County. The mobile home had belonged to petitioner and his wife, who were then in the process of getting a divorce; however, it had apparently been repossessed and subsequently sold to Lyle Messer. When Crit Muncy heard that someone was moving the trailer he called the lawyer representing him in the divorce proceedings and was advised that the trailer was marital property and "the divorce court would decide what was done with that." Later that day, petitioner and his father, Birdie Muncy, drove to the mobile home site in petitioner's car. They took with them two handguns, a .38 caliber Smith & Wesson revolver and a semiautomatic 9mm pistol. Petitioner carried the .38 revolver and Birdie Muncy the 9mm pistol. When petitioner and his father arrived at the trailer park, Lyle Messer and those helping him had the trailer hooked to a wrecker and were attempting to move it. Heated words were exchanged[1] during which petitioner told Lyle Messer he couldn't move the trailer, that it was "in court." While it appeared at one point that the confrontation might end without violence - the mobile home was unhooked from the wrecker and petitioner and his father backed their car away from the trailer and seemed to be leaving - ultimately, gunfire erupted resulting in the death of Lyle

---

[1]The phrase "heated words" does not adequately describe the confrontation which included name calling, near fights between Lyle Messer and petitioner, injuries to the head of one of those helping move the trailer from a blow struck by petitioner and brandishing a firearm by Birdie Muncy.

Messer and the wounding of his wife and brother. The testimony of those witnessing the shooting, even the victims, Rylenea Messer and Paul Messer, differed, however, there is no evidence that anyone other than the petitioner, Crit Muncy, and his father, Birdie Muncy, had a firearm, and all those witnessing the shooting testified that after the initial shots Crit Muncy stood over Lyle Messer, who had been shot and was on the ground, and fired multiple shots into his body. The Muncys then drove away. Later in the evening, they went to the courthouse in Wayne where petitioner made what his appellate counsel described as an "improbable videotaped statement consistent with self defense" and the court at the suppression hearing described as "self-serving," and "trying to basically exculpate his involvement."

In evaluating petitioner's claims, the Court, as an initial matter, takes account of fact that the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA") imposes significant restrictions on the power of federal courts to grant relief in habeas proceedings initiated by state prisoners. Thus, when, as in this case, claims asserted in a federal habeas petition have been adjudicated in state court relief is available only if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or the decision was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Section 2254(d)(2). The critical phrases contained in Section 2254(d)(1) are "contrary to" and "unreasonable application," and the Supreme Court has said that "independent meaning" must be given to both clauses. Williams v. Taylor, 529 U.S. 362, 404 (2000). With respect to the first clause, a state court decision is contrary to precedent "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "the state court confronts facts that are materially indistinguishable

3

from a relevant Supreme Court precedent and arrives at a result opposite to" that reached by the Court. Id. at 405. With respect to the unreasonable application clause, a federal habeas court "may grant relief under the 'unreasonable application' clause if the state court correctly identifies the governing legal principle from [Supreme Court] decisions but unreasonably applies it to the facts of the particular case." Bell v. Cone, 535 U.S. 685, 694 (2002). The focus of this "inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable" as distinguished from being merely "incorrect." Id.[2]

Beyond issues arising under the "contrary to" and "unreasonable application" clauses, a federal habeas court must be mindful that "a determination of a factual issue made by a State court [is] presumed to be correct" and a state habeas petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Finally, and also significant, is the limitation imposed by the AEDPA on receipt of additional evidence by way of an evidentiary hearing when a petitioner has "failed to develop the factual basis of a claim in State court proceedings," 28 U.S.C. § 2254(e)(2), a limitation which, as the court pointed out in Williams v. Taylor, 529 U.S. 420, 424 (2000), can be avoided only by satisfying the "stringent conditions" set forth § 2254(e)(2).[3]

---

[2]In making this distinction, the court referenced its discussion of the "unreasonable application" clause in Williams v. Taylor, supra. at 411, where it had pointed out that "a federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable."

[3]Beyond establishing reliance on a "new rule of constitutional law" or a "factual predicate that could not have previously been discovered," to avoid the limitation on further development of the evidence in federal court, petitioner must show that "facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense."

Taking cognizance of these limits on federal court review of state prisoner habeas proceedings, it is clear that the state court adjudication of petitioner's claims precludes granting relief in this Court.

Initially, petitioner asserts that counsel representing him at trial was ineffective. In ruling on this claim, the court evaluates counsel's performance under standards established by the Supreme Court in <u>Strickland</u> v. <u>Washington</u>, 466 U.S. 668 (1984), recognizing that the proper standard for attorney performance is that of "reasonably effective assistance" and that petitioner must establish not only "that counsel's representation fell below an objective standard of reasonableness," <u>Id.</u> at 687-88, but also that counsel's deficient performance prejudiced the defense, i.e., that "there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different," "reasonable probability" being a probability "sufficient to undermine confidence in the outcome." <u>Id.</u> at 694. The "performance inquiry" requires the court to consider "whether counsel's assistance was reasonable considering all the circumstances," <u>id.</u> at 688, and scrutiny of counsel's performance under the prescribed constitutional standard does not contemplate application of a "set of detailed rules for counsel's conduct," <u>Id.</u>, the Supreme Court having "declined to articulate specific guidelines for appropriate attorney conduct ... ." <u>Wiggins</u> v. <u>Smith</u>, 539 U.S. 510, 521 (2003). Recognizing the "constitutionally protected independence of counsel" and "the wide latitude counsel must have in making tactical decisions," the Supreme Court has admonished reviewing courts that, in resolving ineffectiveness claims, "scrutiny of counsel's performance must be highly deferential," that every effort must be made "to eliminate the distorting effects of hindsight" and that the challenged conduct must be evaluated "from counsel's perspective at the time." <u>Strickland</u> v. <u>Washington</u>, <u>supra</u> at 689. Moreover, courts "must indulge a strong

5

presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Id. Utilizing these standards, the Court does not find in the motion or the record of this case any basis for concluding that counsel's performance was deficient.

Preliminarily, it is noted that petitioner's claims with respect to counsel's ineffectiveness come before the Court on a record made at the state habeas hearing in which petitioner's state habeas counsel failed to secure the testimony of petitioner's trial counsel.[4] As a consequence, with respect to matters upon which petitioner has the burden of proof, much is left to speculation.

Petitioner first asserts that counsel erred in failing to ask prospective jurors on voir dire whether they were unalterably opposed to recommending mercy if a verdict of first degree murder were returned. In a similar vein, he faults counsel for failing to seek bifurcation of the guilt and sentencing phases of his trial.

After noting that under West Virginia law "a defendant charged with first degree murder is entitled to question jurors during voir dire to determine whether any of them are unalterably opposed to making a recommendation of mercy" if a verdict of guilty was returned by the jury, the circuit court found that "trial counsel strategically chose not to question jurors regarding mercy," noting that posing such questions "could potentially appear as conceding something to the jury that counsel vehemently contested during trial." Believing that this choice illustrated "precisely the sort of

---

[4]The sole explanation which the Court could find in the record is counsel's statement that "[i]nvestigation of mitigating circumstances I chose not to call these lawyers because they will argue with me." Clearly, by failing to secure the testimony of trial counsel, petitioner has "failed to develop the factual basis of a claim in State court proceedings." 28 U.S.C. § 2254(e)(2), and neither a new rule of constitutional law nor a previously unavailable factual predicate are involved.

calculated risk that lies at the heart of an advocates discretion," the court found that counsel "reasonably performed under prevailing norms by choosing not to question the prospective jurors during voir dire to determine whether any of them are unalterably opposed to making a recommendation of mercy after rendering a first degree murder verdict." Nothing in the evidence presented to the circuit court calls into question its findings or it characterization of counsel's performance. Moreover, there is no evidence in the record that any member of the jury was opposed to recommending mercy, and, as a consequence, no basis for finding that petitioner was prejudiced by counsel's failure to raise this issue on voir dire.

In determining that counsel's decision not to bifurcate the penalty phase of the trial did not "rise to the level of ineffective assistance of counsel set out in Strickland," the circuit court found inter alia, that counsel had "adequately researched Petitioner's life history,"[5] had "presented this evidence to the jury," and had "presented the jury with a torrent of mitigating evidence throughout the four (4) day trial," which "continued into ... closing argument where counsel reinforced their portrayal of petitioner as a low functioning young man who was under his father's control."[6] Based on these and other findings the circuit court concluded that counsel "provided petitioner with effective representation when they strategically chose to hold a unitary trial after they adequately investigated Petitioner's life."

---

[5] The record indicates that petitioner's counsel and their examining and testifying psychologist conferred with many of petitioner's immediate family and that the psychologist, and presumably counsel, had available voluminous records, "[p]retty much everything that was available that was relevant to this."

[6] Though the circuit court did not reach the question, these findings would also negate any prejudice to petitioner's defense inasmuch as mitigating evidence and argument which might have been presented at sentencing in a bifurcated trial was presented to the jury during petitioner's unitary trial.

Insofar as Muncy bases his claims of ineffective assistance on counsels' failure to voir dire the jury panel about whether they would be opposed to recommending mercy and counsels' failure to seek bifurcation, he clearly has not overcome the presumption that his trial attorneys employed sound trial strategy. Moreover, he has not shown that he was prejudiced by counsel's conduct of his defense in this regard. The standard applied by the circuit court judge in evaluating counsel's performance was the standard required by the Supreme Court in <u>Strickland</u>, and there are no cases, on the same or similar facts, decided differently by that court. Moreover, considering the evidence before the state court judge, that court's application of the <u>Strickland</u> standard to the evidence cannot, in any sense, be considered objectively unreasonable.

Petitioner also contends that his attorneys were ineffective for failing to "retain several experts, such as a crime scene expert(s) to analyze the foot prints, tire marks, and search for bullets (especially for those from Lyle Messer's gun), taken measurements, and perhaps, determine the ballistics." He also believes that a mental health expert "should have testified, not [only] on petitioner's state of mind, but also concerning his lack of being dangerous in the future."

As an initial matter note is taken of the fact that in his order denying habeas relief the judge, who was also the trial judge, found that counsel representing petitioner at trial "reasonably conducted a thorough investigation of all issues." Beyond this, however, is the fact that, though petitioner contends that "crime scene experts" should have been retained, what such experts might have found or testified to is purely a matter of speculation. There is nothing in the petition, the habeas hearing or the record of this case indicating what such testimony might have been, and, in light of the fact that the evidence at trial indicated that only petitioner and his father were armed, it is difficult to see how such expert testimony would have been of assistance. With respect to the contention that

counsel should have presented testimony from a mental health expert concerning petitioner's "lack of being dangerous in the future," again, nothing has been presented which would indicate that such was the case or that a "mental health expert" could or would so testify. As a consequence, there is no basis for concluding that counsel's failure to secure such evidence amounted to ineffective assistance or that it prejudiced his defense. It necessarily follows that the state court's determination that petitioner's attorneys were not ineffective for failing to secure the services of experts, including mental health experts, was not contrary to or unreasonable application of Supreme Court law.

Citing an exchange between a grand juror and the Wayne County prosecuting attorney, petitioner next contends that his Fifth and Fourteenth Amendment right to a fair and impartial grand jury was violated. During the exchange the grand juror informed the prosecutor that he knew "the victims in the case," and that he could "refrain from voting." The prosecutor informed the juror that if he thought "it would affect [his] ability to hear the case" he could withdraw, but if he didn't think it would have any effect he could remain, adding that the fact that he knew the victims would not effect his right "to sit and deliberate" and only if he felt his knowledge would affect how he might vote would he be required to withdraw. When the grand juror responded in the negative, he was advised by the prosecutor that he could "continue."

The fact that a grand juror knows victims, without more, does not, of course, establish that the grand juror is biased either for or against a potential defendant, and in this case the grand juror indicated that his knowledge of the victims would not affect how he might vote. Beyond that, however, is the fact of petitioner's conviction by a petit jury which "means not only that there was probable cause to believe that [petitioner was] guilty as charged, but also that [he is] in fact guilty as charged beyond a reasonable doubt." United States v. Mechanik, 475 U.S. 66, 70 (1986). Under

9

such circumstances, and following conviction, "the petit jury's verdict rendered harmless any conceivable error in the charging decision that might have flowed" from the fact of the grand juror's acquaintance with the victims. Id. at 73. It necessarily follows that, with respect to this claim, petitioner has failed to show that the habeas court's decision was contrary to or an unreasonable application of Supreme Court law.

Petitioner asserts that his video statement "was not given knowingly and intelligently[7] due to his mental deficiencies."[8] Findings by the court following a suppression hearing prior to trial, as well as findings following the hearing on Muncy's state habeas petition, were to the effect that, prior to the taking of his statement, petitioner was advised of his Miranda rights, and that he knowingly and intelligently waived those rights without any coercion.

Before addressing this claim, however, it is important to note that undisputed evidence establishes that petitioner, together with his father, came to the Wayne County Jail on his own "to cooperate with the police in the matter that he was involved in up on Marrowbone Creek," that he "wanted to tell his story," that he had not been arrested at the time he gave his statement, that he was advised that he was not under arrest and was "free to go," and that it was not until after he had given his statement that he was arrested.

---

[7]As best can be determined, it appears that petitioner is contending that "mental deficiencies" precluded a voluntary and knowing and intelligent waiver of Miranda rights and a voluntary statement.

[8]A psychologist retained by counsel for defendant testified at trial that the final I.Q. scores he got on testing "were a full scale I.Q. of 57," but that "because maybe he was not putting forth his best effort ... it is my professional opinion that his true value of functioning is between the mild range of mental retardation with an I.Q. in the sixties at best." He also testified that "[a]nything below seventy is in the bottom two percent of the population" while "[a]nything below about sixty-five is in the bottom one percent of the population." The psychologist, as well as two other examiners, had concluded that Muncy was competent to stand trial.

The obligation to administer Miranda[9] warnings attaches "only where there has been such a restriction on a person's freedom as to render him 'in custody,'" Oregon v. Mathiason, 429 U.S. 492, 495 (1977),[10] i.e., considering the totality of the circumstances, an individual's "freedom of action is curtailed to a 'degree associated with formal arrest.'" Berkemer v. McCarty, 468 U.S. 420, 440 (1984). Clearly, Muncy was not "in custody" when he gave a statement, and as a consequence, Miranda warnings were not required. Moreover, in the absence of any evidence or, indeed, claim of coercion on the part of law enforcement officers, petitioner's reliance on "mental deficiencies" which allegedly rendered his statement involuntary under the Due Process Clause provides no basis for relief inasmuch as "[a]bsent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." Colorado v. Connelly, 479 U.S. 157, 164 (1986). While "state laws governing the admission of evidence" may be relevant, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." Id. at 167. In the absence of any evidence of coercive police activity in this case, petitioner's mild mental retardation provides no basis for finding his statement involuntary.

The state court, as noted, did find that petitioner had voluntarily and knowingly and intelligently waived "his right to remain silent and to counsel before giving his statement claiming self-defense ... ." Taking note of the fact that "[e]very mental evaluation conducted on petitioner ... found him competent to stand trial," of the fact that, though he might "have a below average intelligence ... he possessed enough intelligence to marry, possess a drivers license, and hold down

---

[9]Miranda v. Arizona, 384 U.S. 436 (1966).

[10]See also, United States v. Howard, 115 F.3d 1151, 1154 (4th Cir. 1977).

11

numerous jobs," that he "had previous experience with law enforcement officials regarding previous criminal charges," and that law enforcement officials "meticulously read the waiver of rights form and Miranda warning ... and had [him] sign them," the court found that "Petitioner intelligently waived his right to counsel and right to remain silent and willingly gave his statement to the arresting authorities." According the factual findings of the habeas court a presumption of correctness, 28 U.S.C. § 2254(e)(1), the Court finds, from its review of the record, that, considering "the totality of the circumstances," Miller v. Fenton, 474 U.S. 104, 117 (1985), petitioner's waiver of his Miranda rights was voluntary and was knowingly and intelligently made. As has previously been noted, there is no evidence indicating any coercion the part of law enforcement officers with regard to petitioner's statement and there is none with respect to his waiver of Miranda rights.[11] While he clearly was "mildly mentally retarded," that fact, standing alone, and in light of the factual findings with respect to petitioner's ability to understand, would not preclude "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." United States v. Cristobal, 293 F.3d 134, 140 (4th Cir. 2002). This thirty-six year old man had completed the seventh grade in school,[12] though failing his "oral test" several times, he ultimately passed the test and secured a drivers license, he did, as the court noted, marry, and obviously acquired property during his marriage, his Miranda rights were, as the habeas court described it, "meticulously" read to him twice and the officers testified that he appeared to understand his rights, he wanted to make the statement and knew "enough to mitigate his involvement," indicating that he was "acting in self-

---

[11]The inquiry with respect to voluntariness is the same under Miranda and the Due Process Clause. Colorado v. Connelly, supra at 169.

[12]He left school during "his second year in the eighth grade, making very poor grades."

defense." Finally, as the Court also found, when petitioner gave his statement he did not "seem to be in a stress situation," he "knew the details of what went on," and he was "oriented as to the proper time, as to the place." Considering all these circumstances, the Court concludes that petitioner voluntarily, knowingly and intelligently waived his Miranda rights and that the statement he gave was voluntary.

Petitioner's remaining claims require little comment. He asserts that the evidence was insufficient, drawing inferences from the evidence which are clearly different from those drawn by the jury and including "evidence" which does not appear to be in the evidence presented to the jury. From the Court's review of the record, however, it is plain that the evidence, viewed in the light most favorable to the prosecution, was such that "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 318-19 (1979). Finally, petitioner's claim that the court erred in "allowing petitioner to proceed to trial without re-examining his mental competency to stand trial," is unsupported by the record. Multiple medical examiners whose reports were considered by the court concluded that petitioner was competent to stand trial, and nothing in the record of this case indicates otherwise.

## RECOMMENDATION

On the basis of the foregoing findings of fact and conclusions of law, it is **RESPECTFULLY RECOMMENDED** that relief be denied and that the petition for writ of habeas corpus be dismissed.

Petitioner and Respondent are hereby notified that a copy of these Findings and Recommendation will be submitted to the Honorable Robert C. Chambers, , United States District Judge, and that, in accordance with the provisions of Rule 8(b), Rules Governing Section 2254 cases,

the parties may, within thirteen days of the date of filing of these Findings and Recommendation, serve and file written objections with the Clerk of this Court identifying the specific portions of the Findings and Recommendation to which objection is made and the basis for such objection. The judge will make a de novo determination of those portions of the Findings and Recommendation to which objection is made in accordance with the provisions of 28 U.S.C. § 636(b) and the parties are advised that failure to file timely objections will result in a waiver of their right to appeal from a judgment of the district court based on such Findings and Recommendation. Copies of objections shall be served on all parties with copies of the same to Judge Chambers and this Magistrate Judge.

The Clerk is directed to file these Findings and Recommendation and to mail a copy of the same to petitioner, respondent, and the Office of the Attorney General of West Virginia.

ENTER: July 29, 2009

*[signature]*
MAURICE G. TAYLOR, JR.
UNITED STATES MAGISTRATE JUDGE